312, 311, Eugene D'Ambrosalski v. Brochers. I was actually preparing for arguments the night before last. I know that comes as a shock that a lawyer would wait that long to prepare his arguments before this court. And I looked at my brief and the commission decision and page four of the commission decision was missing. And my brief took it right from the record. So I went and checked the record and it's not there. So with the help of calling your very able clerks, they suggested I get a motion on file, bring extra copies today. I called counsel yesterday. I don't believe she has any objection. I did mail a motion in to the court to supplement the record. But basically, for an entire commission decision, really what it does is it adds the one page, which is page four. And if it's acceptable to the court, I'd like to leave with bailiff copies of this. So in case you want it sooner, you don't have to wait for the mail. Appreciate that. Thank you, counsel. And now, I might say you get a great feeling when you're preparing your arguments and you realize something like that has happened. I can't tell you how wonderful that is. Anyway, I represent Mr. Demersowski. He's a 45-year-old railroad yard worker. He worked there two years, good attendance, worked overtime. It's a company that washes and services chemical railroad cars. And they basically push and pull these cars with something like a half of a diesel engine that, by the record, goes four miles an hour or so. My client had prior back problems. In 1994, he had strained his back. And in December of 2008, he wound up at Provino St. Joe's Hospital because his back was bad enough that it would be hospitalized. They did an MRI. It's Petitioner's Exhibit 3. It's in the record at page 230, where, as to L4, L5, which is the condition we're talking about now, the radiologist notes on the actual images, there's no focal herniations or significant spinal stenosis. It's at the very most a generalized disc bulge at L4, L5 without significant central or pheromonal stenosis. If I get too far into the medical, I think it's a fair assessment to say the overarching issue here in this case, and before the commission, was the claimant's credibility. I mean, I think it's clear from the commission's decision they clearly had a problem with the credibility of your client, particularly with regard to the issue that placed great emphasis on the fact that when he was asked by the supervisors, whether he had a work-related injury, he said no. So how do you get around the credibility issue? Isn't that a matter for the commission? Well, I think it's like, if I can give Your Honor an example first, and I'll answer the specific question in regards to the specifics of the case, it's like if someone were to get on a railroad car and be a normal person with two legs and walked off the railroad car as an amputee with one leg, I think this is my brief as an example, you'd say, hey, there's some medical evidence that the person suffered an amputation. But I think that's also overwhelming evidence that there was some incident that occurred on the railroad track that caused the amputation. This is really much the same case. I mean, I think the commission had a problem with credibility because of something that my opposing counsel did, which in order to win the case was probably a smart thing, but I really don't know how appropriate it was. Early on in cross-examination, she asked my client, didn't you flunk a drug test because of cocaine? And I objected, and the response was, well, it will explain its conduct. And bear in mind, I'm trying the case. There's two witnesses outside. It says, oh, my God, here comes some evidence of intoxication. I don't condone the use of that. But by the time the two witnesses were done, it was very clear that my client was not under the influence of anything, was acting completely normal, and this accident which occurred, which was a major accident, it was the derailment of a railroad car, was not even small. But that ties into what the commission is saying. Your claimant said, he testified, that he felt a shot go through his body. He experienced pain symptoms during and after the work accident. Yet the commission is saying when the supervisors talked to him, he said that there wasn't. He was not injured. He didn't suffer an injury. I think if that's what the commission is saying, they're to a degree mischaracterizing the testimony. What he testifies is he jumps off a railroad car and is moving about four miles an hour. He lands on some rocks. He doesn't fall. But he says it felt like a jolt or a speed bump, I think is correctly quoting the record. Right. And he said, he also said if somebody asked me at that time if I was hurt, I would have said no, because I've had back pain before. I didn't, I don't know if the record says this, but he didn't feel anything new or different at that time. This conversation that the commission grasps on happened within a half hour of the incident under the, with an overarching reason being that they were investigating why a railroad car derailed. And that's why I do think, I agree with you, Your Honor, that the commission didn't give my guy a lot of credibility. But I don't think my guy did anything to deserve that not wanting to find credibility other than, like I said, he probably should not have inhaled cocaine at some stage. But, Your Honor, I think the major thrust of my argument, and clearly it's in the briefs, is the, his testimony was overwhelmingly, convincingly, clearly evidently corroborated. Much as the amputee that hops, much as the person that hops on the car and walks off an amputee, that he had had this injury as he described it. Yeah, because he keeps citing that example. That observation, there's no credibility determination in the example you gave. Somebody's an amputee, it's obvious, it's visible. It doesn't depend on the credibility of the claimant, does it? And likewise, in this case, if you look at Dr. Goldberg's report, and it's their doctor, their Section 12 doctor, he reviews the medical records, only central and right-sided complaints. And with a generalized bulge, which is what the radiologist found at the hospital, that's what you can have. Then you have the incident, and within a very short period of time afterwards, there is an MRI that shows a larger left-sided disc, and by Dr. Goldberg's opinions, that larger disc is what's producing this new left-sided radiculopathy, which starts clearly, by anyone's estimation, within a week of the accident. And that's why, Your Honor, I've tried a few cases in my life. I didn't go into this case just thinking, hey, just put on the petitioner and see if it flies. I thought corroboration might be a good idea. I thought the case was fully corroborated by Dr. Goldberg's testimony. As a matter of fact, he wrote two reports. In the first report, which is at, for the record, page 678, Respondents Exhibit 7, he says, I don't want to get involved in this factual dispute, because he sent him the witness statement. As to what happened, he said, if he jumped off a moving railroad car, it appears that the herniation is due to this accident. The reason for this is he never had left-leg radicular pain, and was always in the right leg based upon prior records. And Dr. Goldberg had reviewed all these. Judge, my guy is not either bright enough or capable, of reporting new symptoms to know that, boy, I have a new larger left-sided disc. I can take advantage of it. That's something that only the doctors discover on the MRI. And more importantly... They never believed he jumped off the railroad car. Pardon? They never believed he jumped off the railroad car. They believed he was running after the car. Well, they didn't say that. It's interesting what they did or didn't say. That's what Roderick said. They didn't believe Roderick either, because Roderick was impeached on the only major issue he testified. Wait a minute. You know, Roderick testified that immediately after the incident, your client said it was okay. Roderick testified that your client never indicated he had jumped off the railroad car. He said he was out of breath, because he'd walked 75 to 100 feet without limping, and that Roderick claims he heard your client say that he was out of breath because he'd been chasing after the railroad car on foot. Which is obviously contrary to what my client said. I understand that, but who decides credibility? Well, the commission, if you read their decision, did not decide that Roderick was credible because we basically destroyed his credibility. He testified, I understand, under oath. If I might, I'm reading the commission's decision here, and it said the petitioner failed to rebut Roderick's testimony that the petitioner attributed his post-accident shortness of breath to running alongside the railroad car. Very clearly, the commission did consider that. The commission talked about a failure to rebut, but then went to the sequence of events, and my thought as a trial lawyer is if your client tells story A and their witness tells story B, I think that the trier of fact has in front of it the two stories and it's a question of which one do you believe. Now, your question for me is, well, doesn't the commission have a right to believe Roderick, in which case I lose? And my response is Roderick clearly, at the best, misrepresented the testimony, because when he testifies at trial, he testifies, oh, I couldn't see the other guy because he's on my blind side, but I knew he was on the ground because he radioed me, and that's the one time I heard him talk about it. It turns out he gave a witness statement, and we weren't there for this. He said it was the day of the accident, but it turns out it was three weeks after, but I understand discrepancies between one day and three weeks when he gave a witness statement. That's not fatal to a witness's credibility. But what I think is, is when he hits the stand and says, I know he was doing this because my sources, I heard him on the radio, but three weeks after the accident, he says, our supervisor, Lance Lewis, was notified immediately. I heard Gene explain to Lance that after he hooked up to the car, he was walking by it as I was pushing it up. He's making it up. I mean, you either have one source or another. He said there was only one source, and they're diametrically opposed. And that's why the commission said at the end of their decision, and it's a nine-page decision, and only the last two paragraphs deal with the commission's findings. The first thing they say is we're going to decide this based on the sequence of events, and that's not even a proper legal analysis. That's an analysis chain of events for medical causation. But then when they go into what the sequence of events was, they don't talk about Roderick being credible, and they don't say we believe Roderick. That's not what they decide because he wasn't credible. I don't think any reasonable finder of fact would find a man that tells completely opposite stories under oath on the witness stand versus what he writes three weeks on the only material issue on which the gentleman testifies credible. I think what's credible is the fact that this case was corroborated by Dr. Goldberg's testimony that, yeah, the person walked in with, at the best, a small-sided herniated disc. Actually, even three days before this accident, he was at the doctor with only right-sided complaints. He got his pain down to a three out of ten, so he was doing better. He had a prior bad back. And within a week after, he not only has significant left-sided complaints, but they're corroborated with a larger disc. And the only thing that happened is he was working at the railroad yard, and then he goes home and watches television because he's been walked off the premises for the cocaine. So I think the evidence is clear. I think in terms of, yeah, he told the safety guy within half an hour I wasn't hurt. He said, I didn't think I was hurt then. And it's very common in back injuries that you wake up the next morning, and that's when you notice the problem. I mean, if this were a person that never went on and off a railroad car before, it might be significant that, yeah, I jumped off a four-mile-an-hour car. That's what these people do all day, though. I mean, everything I think in terms of reasonableness, reasonable inferences, you have to take in context. I think that's what we do. And I think in context, I think Mr. Dombrosowski did nothing to not have his testimony believed, and I think his testimony was corroborated, and I think the opposition evidence just wasn't there. I mean, what it was is one person that said, well, he radioed me, but earlier he says, well, actually I overheard him tell somebody else this, so that person's not believable. Then you have the safety guy, and I'm not doubting that he may have asked him within the half hour, were you hurt or not, and then my guy didn't remember it. But the point is, he didn't know he was hurt within that half hour. It was the next morning when he woke up. And he didn't understand it. He's trying to live with it. Excuse me. What is it when you feel a shock go through your body? What does that mean? If I jumped up and down right now 12 inches, Your Honor, I would feel a shock go through my body. You wouldn't. And that's what it would be. I would think so. Wouldn't you? Have you ever, you know, landed hard and played basketball or whatever? Felt a shock go through my body? That's not like somebody hitting me with a feather, you know. No. I mean, it's what happens if you jump three feet off a railroad car. But the point is, he wasn't limping. He wasn't in horrific pain. He didn't have any left-sided pain that day. That was the next morning. That's commonly seen. Goldberg conditions his opinion on the fact that he actually did jump off a railroad car, doesn't he? No. The first report he does. The second report he does not. Because here's the thing. The only thing that could account for the new left-sided symptoms was that increased disk, which he had to do somehow. He's working at this job, and the next thing you know, he's home watching TV. So where did it happen? That's why I think this is a very strong circumstantial case. He went there without the petitioner's testimony. But I think they're taking the position they know it didn't happen jumping off a railroad car. I think that's exactly what the commission said. We don't believe that you jumped off a railroad car, and therefore Goldberg's opinion is useless because he conditioned the injury on believing that he jumped off a railroad car, and that's where he made the connection. And as Justice Harris said, the commission believed Roderick. This is nonsense that they didn't believe him. And they specifically said you didn't rebut it. And if you didn't rebut it, they accepted it as evidence, and they wouldn't accept it as evidence if they didn't believe it. I've never known of a rule of evidence where you have to rebut a noncredible witness, and I believe he was proved noncredible. To answer your question about Dr. Goldberg, the second report he wrote was Respondents Exhibit 15. It's at the record at 774. It's a simple two-paragraph report, if I could just read part of it because I know time's wasting. Hence, the accident of March 4, 2010, aggravated the small herniation at L4-5. In fact, on the MRI of April 6, 2010, it appears to be larger. In terms of treatment and recommendations, I set them forth prior in my independent medical evaluation. That's the report you were referring to. They are unchanged. It appears that the patient did have the herniation at L4-5, but it has become increasingly symptomatic and larger in size from his work-related accident March of 2010. And what did he say in the first report? In the first one, he said he wasn't going to get involved, but then he realized... He indicated that if the complainant had indeed jumped from a railroad car, then it appears that the herniation is due to the accident. That's true. And then he changed his mind. He didn't change his mind. He didn't have to say that the guy jumped again. He reported medical. Come on. Judge, I think the thing is there is no other reasonable explanation for how that disc got larger. You got a guy. He's working. He's supposed to be on the railroad car. He says he jumped off. You have a noncredible witness that says he didn't jump off. The next day, he feels a lot of pain. Even then, he tries to tough it out for a few days, goes to his doctor with the history of it. It's corroborated by that disc, just like the amputee walking off the railroad car when he walked out on two legs. It's the same thing. It's a story that can be told.   So there is no other reasonable explanation for how that disc got larger. Counsel, your time is up. Thank you very much, Your Honor. Pleasure to be here. Counsel, you may respond. Good morning. May it please the Court, Justices? Mr. Black. Opposing counsel has done a very good job of trying to confuse the issues. The main issue here is, was the decision of the commission against the manifest weight of the evidence? In his brief, he alluded to the fact that the sequence of events reasoning by the commission changes the standard of review from manifest weight to de novo. And I think it's clear from what's been argued that it doesn't. It's, was the decision of the commission against the manifest weight of the evidence? And what do we look at to determine that? We look to see, was there any evidence in the record or in the testimony to support the decision? Clearly there was. When you try a case before the commission on an issue of accident and causal connection, you first look to see, was there an accident? That's the first prong. If you don't get past the first prong, all other issues are moot. The petitioner did not get past the first prong. And how did the commission know that? They looked to, what happened on the day of the accident? That's what everybody does, right? What did the petitioner report? What did he write in his own statement? Were there any witnesses that can corroborate what he said? What did he tell his supervisor? That's the most important information that the commission looks at. What did you say right away? That all makes a lot of sense, and I think opposing counsel recognizes that, to which he replies, ah-ha, yes. Even if there's some credibility issues and everything you say is true, he has this bulging, his medical evidence is bulging, this explained there had to have been an injury. How do you respond to that? My response to that is, you know, as was previously indicated, that Dr. Goldberg indicated in his first report that his opinion is based upon the hypothetical assumption that he actually jumped. He hadn't had an MRI between December 15, 2008 and April 6, 2010. That's a year and eight months. He could have had any slew of complaints between them. And the only doctor he was treating with lost his license right after this case started. We won't hold that against the claimant, though, will we? We won't hold that against the claimant, but we can't be sure as to what the doctor was documenting. We know that he was prescribing him narcotic medication for two years without prescribing any diagnostic test. I think it's safe to say that, you know, if Petitioner's disc had been excessively larger, fine, it was only a little tiny bit larger. He had disc dehydration, which you can see from the MRI from December 15, 2008, showing that his discs were dehydrating. So, you know, Dr. Goldberg's opinion is based upon the fact that an accident actually happened, and here we know it didn't. You look at what he told Mr. Roderick, the person that's with him the same day, and who has no control over whether he's going to be hired or fired or whether anything's going to happen because of the derailment. It's someone that works with him. It's a co-worker. He's concerned about him. He says, you know, I'm on the ground, push the rail car back. All of a sudden, you know, he's saying it's he's on the radio saying it's decoupling. If you're on the back of a rail car and it's derailing, you're on a loose rail car, it's going to hit a derailer, and you don't know which way it's going to go. Are you going to take your radio out of your pocket and take the time to say it's derailing, it's derailing? No. He testified he had seconds before he jumped off that car. He doesn't know if it's going to go to the right or the left. If he went to the left and it goes to the left, he could be crushed and killed. He testified, I was running beside the car. Is there a safety rule that says you're not to be riding the car? You're not to be riding the car? Yes. No, I don't think. They can either walk or ride. It's their choice. They have their choice. They have their choice, correct. But you cannot hop on while it's moving. Okay. So there is a safety rule you can't ride a moving car. No, you can ride a moving car. You just can't hop on or off a moving car for safety purposes. So he tells Roger. Roger says, are you okay? I'm fine. They walk over to their immediate supervisor, Lance Lewis. Mr. Lewis says, are you okay? Were you injured? The judge says, I'm fine. There's two people within ten minutes. Then where do they go? They go to the safety supervisor. He says, are you okay? Are you hurt? Was there any property damage? No, I'm not hurt. No, there's no property damage. Okay, we have to fill out paperwork now. They fill out the supervisor's safety report. Again, he says, are you hurt? Was there any property damage? To which he says no. Then he's given his own opportunity to fill out his own witness statement. He never once says in the witness statement, I jumped from a moving rail car. In fact, he never told anybody that. And he never said he was hurt. If counsel wants to say, okay, he didn't have complaints of pain until, you know, a couple days later or the next day, fine. But why didn't he put in any of those reports or testify to any of those people that he jumped from a moving rail car? It's like leaving the Miranda rights off of a police officer's statement. It's the most important thing about the story. I jumped from a moving rail car. That should be noted. What else is noted is that he didn't seek treatment until after he was terminated. That says something. That's another thing that the court looks at. Okay, what did you tell your employer? This is what you told your employer. This is what you told the witness. These are the reports you filled out. Okay. Now the accident's over. What did you do next? When's the next time? When did you seek treatment? Did you seek it the same day? No. Even though he told all of his doctors I had immediate onset of low back pain. It felt like a shock going through my body like a car hitting a speed bump. Yet you'll notice on page 51 of the transcript he tells Dr. Giacchino and confirms on cross-examination that I didn't go to the hospital after the accident because the employer wasn't concerned about my injury. What injury? You never told us you were injured. Four different times you were asked. And you had the opportunity to fill it out yourself. And you never said that you jumped from a moving rail car or that you had an accident. There's overwhelming evidence that there was no accident, that he never jumped. We would ask that you affirm the circuit court's decision adopting the commission's decision. Thank you, counsel. Counsel, you may reply. I'll try not to be a dead horse. Counsel, I know we have a long day. But first of all, as far as the witness statement that my client gave, first of all, this is all within half an hour. In fact, Respondents Exhibit 18 is just page 781 of the record. And remember, this is investigating, it's not investigating an injury. It's investigating a railroad car derailment. And what he says is, first we hook up to that car and started pushing it to the building. So he says, we hook up to the car and started pushing it. It doesn't sound like he's walking on the side. And to the building. On my countdown, four cars, three. On two cars' countdown, the driver slowed down. That's when the car came unhooked by itself. And I don't think there's any dispute about that. Mr. Roderick confirmed that. So a couple things. Counsel said he couldn't have gotten the radio out of his pocket. The radio wasn't in his pocket. He was talking to the guy on the radio all the while this was happening. I'm sure the misstatement's unintentional, but he was holding the radio when this was happening. So he didn't have to pull it out. As far as the witness statement, if anything, it says that we were pushing it. Which, if you're on the ground, you're not pushing it. You're not doing anything. He was part of, if he was riding it, he would have been. And common sense, there's no, I mean, if you have credibility issues, look to common sense. There's no reason a person's going to walk when it's a fairly healthy distance. You're talking multiple railroad cars. And he can just hook a ride. As far as the doctors, he had two doctors, not just one he was treating with before, Dr. Massoud as well as Dr. Diaccino. As far as the disk dehydration that counsel referred to, that was actually at the lower level. If you look at the MRI, that was L5S1. And if you look at Dr. Goldberg's report, the problem level he has is L4, L5. As far as him telling multiple people he's fine, this is all within the first half hour. We don't dispute that. He never disputed that. He said, if anybody had asked me, I just thought I was fine. This is a situation where they're all excited because a railroad car derailed. So he well could have been asked. I wouldn't deny that. I think the commission has a right to believe it. But in context, that's in the first half hour. He wakes up the next morning with the problems, and he doesn't tell the doctors he felt immediate pain. As a matter of fact, if you look at the first doctor's record, she's Massoud, who's the general practitioner who still does have his license. He said the giveaway pain actually started happening the day before he saw him, which would have been roughly March 9th. But the radicular pain and the pain on top of the foot started the day after this happened. So I think you have a case that you might call it medical evidence, but in my book, evidence is evidence. It corroborates that he had an accident, that this didn't move itself. And it was doing something he was supposed to be doing at a time he was supposed to be doing it. And I think the opposite result is clearly evident, which is what manifest rate requires. And on that note, I wish everyone a good day. Thank you, counsel, both for your arguments in this matter. We take them under advisement. This position will issue.